# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CATHARINE G.,                    )
                                 )
         Plaintiff,        )
                                 )
   v.                            )        1:24CV982
                                 )
FRANK J. BISIGNANO,              )
Commissioner of Social           )
Security,                        )
                                 )
         Defendant.[1]     )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Catharine G., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 11 (Plaintiff's Brief); Docket Entry 13 (Commissioner's

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute as Defendant in this suit. Neither the Court nor the parties need take further action to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Brief)).  For the reasons that follow, the Court will remand this matter for further administrative proceedings.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 278-84), alleging a disability onset date of July 13, 2019 (see Tr. 278, 281).  Upon denial of that application initially (Tr. 97-105, 149-53) and on reconsideration (Tr. 106-15, 155-59), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 160-61).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 71-96.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 116-37.)  The Appeals Council thereafter granted Plaintiff's request for review (Tr. 212-14, 387-88, 138-43), because "the VE was not provided a hypothetical that included the limitation to no production rate pace contained in the assessed residual functional capacity" (Tr. 140 (internal parenthetical citation omitted)).

The ALJ held a new hearing, attended by Plaintiff, her attorney, and a different VE (Tr. 38-70), and again issued a decision denying benefits (Tr. 14-37).  The Appeals Council subsequently denied Plaintiff's request for review (Tr. 1-6, 276-77, 415-16), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

---

[2] On consent of the parties, "this case [wa]s referred to the [undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 9 at 1.)

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2023.

2. [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 13, 2019, through her date last insured of December 31, 2023.

3. Through the date last insured, [Plaintiff] had the following severe impairments: asthma, anxiety, and obsessive-compulsive disorder.

. . .

4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [s]he could tolerate no more than occasional exposure to dust, odors, fumes, and pulmonary irritants. She could also perform simple, routine, and repetitive tasks; maintain attention and concentration to perform those simple, routine, and repetitive tasks in an eight-hour workday; and make simple work-related decisions. She could lastly tolerate occasional interactions with supervisors, coworkers, and the public.

. . .

6. Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that

3

existed in significant numbers in the national economy that [she] could have performed.

. . .

11. [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from July 13, 2019, the alleged onset date, through December 31, 2023, the date last insured.

(Tr. 19-31 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court will remand this case for further administrative proceedings.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

4

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of

_____

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four

---

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only

then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignment of Error

In Plaintiff's first and only issue on review, she argues that "[t]he ALJ failed to apply the correct legal standard and adequately account for the vocationally limiting effects of Plaintiff's well-documented [obsessive-compulsive disorder ('OCD')] in the RFC." (Docket Entry 11 at 5 (bold font and block formatting omitted).) In support of that argument, Plaintiff points to her

---

after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

own testimony regarding the severity and impact of her OCD symptoms (see id. at 5 (citing Tr. 47, 49, 55-58, 62, 64)), "medical evidence of record [] supportive of [her] testimony" (id.; see also id. at 5-6 (citing Tr. 474, 622, 624, 625, 628, 631, 641, 647, 650, 654, 660, 663, 666, 669, 676, 678-79, 684, 746-66, 852-53, 860, 870, 872, 879, 880, 884, 1018-24, 1028, 1031, 1033-34, 1046, 1049, 1052, 1055, 1058, 1062, 1065, 1068, 1071, 1074, 1077, 1080, 1092, 1145, 1148, 1151, 1154, 1160, 1163, 1165, 1169, 1171-72, 1175, 1178, 1181, 1187, 1191, 1197, 1200, 1269-75)), and opinions from treating therapist Robert Milan, LCSW ("LCSW Milan"), as well as treating psychiatrist Dr. Matthew Conner, that Plaintiff's OCD symptoms disabled her (id. at 6 (citing Tr. 865, 867, 1017-18, 1028, 1276)). Plaintiff contends that, "[d]espite . . . th[at] documentation of [Plaintiff's] impaired concentration, ruminations, and OCD rituals, . . . the ALJ still determined that [Plaintiff's] alleged symptoms were not entirely consistent with the medical evidence." (Id. at 7 (citing Tr. 22).) Plaintiff contends that "[t]he ALJ's reasoning [in that regard] must fail[,]" because 1) "the ALJ's description of [Plaintiff's] MSEs as 'stable' . . . misses the mark, as the MSEs continually and consistently document her severe symptoms" (id.), 2) "the ALJ . . . erred [] by essentially weighing [] normal [fund of knowledge, intact language, intact insight, and intact judgment] . . . that are irrelevant to the severity of OCD against

9

the abnormal signs that substantiated [Plaintiff]'s OCD" in violation of <u>Arakas v. Commissioner, Soc. Sec. Admin.</u>, 983 F.3d 83, 97-98 (4th Cir. 2020), and <u>Shelley C. v. Commissioner of Soc. Sec.</u>, 61 F.4th 341, 361-62 (4th Cir. 2023) (<u>id.</u> at 9), and 3) "the ALJ inexplicably note[d] (and repeatedly so) that [Plaintiff]'s ability to 'self-direct an extended and complicated taper off of her benzodiazepines' [wa]s inconsistent with her allegations" (<u>id.</u> (quoting Tr. 25-27)). According to Plaintiff, "the ALJ failed to fully account for [Plaintiff]'s limitations resulting from her severe OCD[,] . . . includ[ing] . . . any time off-task and absences related to her intrusive ruminations and compulsions." (<u>Id.</u> at 11-12.) For the reasons that follow, Plaintiff's arguments possess merit and warrant remand.

The Commissioner's regulations adopt a two-part test for evaluating a claimant's statements about symptoms. <u>See</u> 20 C.F.R. § 404.1529; <u>see also</u> Social Security Ruling 16-3p, <u>Titles II & XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304, at *3 (Oct. 25, 2017) ("SSR 16-3p"). First, the ALJ must determine whether a claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [the claimant]'s symptoms, such as pain." 20 C.F.R. § 404.1529(b); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source" to establish the existence of a medically determinable impairment "which could reasonably be expected to produce the pain or other

10

symptoms alleged." 20 C.F.R. § 404.1529(a); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *3. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements" and "must be shown by medically acceptable clinical diagnostic techniques," 20 C.F.R. § 404.1502(g)) and laboratory findings ("anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," 20 C.F.R. § 404.15029(c). <u>See</u> 20 C.F.R. § 404.1502(f); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *3.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of "the intensity and persistence of [the claimant's] symptoms," as well as "the extent to which [those] symptoms limit [his or her] capacity for work." 20 C.F.R. § 404.1529(c); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

11

1. [ D]aily activities;

2. The location, duration, frequency, and intensity of [] pain or other symptoms;

3. Precipitating and aggravating factors;

4. The type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms;

5. Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;

6. Any measures [a claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, or sleeping on a board, etc.); and

7. Any other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2) (emphasis added); see also SSR 16-3p, 2017 WL 5180304, at *5.

In this case, the ALJ found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's

12

"statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 22.)  The ALJ supported her part two finding with the following analysis:

> Based on the several findings in the record showing <u>full orientation, intact associations, organized and linear thought processes, and intact language for repetition</u> despite notes of her impaired attention, an instance of difficulty being redirected, and her complaints of difficulties focusing due to persistent anxiety symptoms or fears of contamination, she has moderate limitations in concentrating, persisting, or maintaining pace. . . .  She has moderate limitation in adapting or managing oneself as demonstrated by notes of her <u>intact insight, intact judgment, and her ability to essentially self-direct an extended and complicated taper off benzodiazepines</u> despite her complaints of persistent or intermittently worsening symptoms, her allegations of issues going grocery shopping or letting maintenance workers in her home, and suggestions that she cannot function due to extreme anxiety. . . .
>
> [Plaintiff]'s statements regarding her conditions are at most partially consistent with the available medical evidence, which supports no greater limitations than those outlined [in the RFC].  Testimony somewhat mirrors mental health records regarding her fears of contamination, allegations of emotional responses to irrational triggers, and worsened symptoms when tired, hungry, stressed, or sick.  However, her longitudinal mental health history is not consistent with her ultimate allegations of disability. . . .  [P]sychiatric records show that, <u>despite her complaints of persistent symptoms with each reduction, [Plaintiff] has essentially been able to self-direct her extended and very precise taper off benzodiazepines with the assistance of a physician</u>. There is no evidence that she had any apparent need for inpatient care for these persistent or extended symptoms, and <u>mental status examinations consistently revealed overall clinical stability no matter her complaints</u>. Treatment notes also include her psychiatrist's implications that much of her psychological issues appear

13

> heavily influenced by situational stressors, including relationship problems, occupational concerns, grief, and a possible fixation on the conceivable extremes of withdrawal from longstanding benzodiazepine use. However, even despite these stressors and likely reduction in function, <u>the overall evidence of record suggests that she remained stable</u>.

(Tr. 26-27 (emphasis added) (internal parenthetical citations omitted).) As the following discussion will show, the ALJ erred in all three respects alleged by Plaintiff in the evaluation of Plaintiff's subjective complaints of OCD symptoms.

Plaintiff first challenges "the ALJ's description of the MSEs as 'stable' or reliance on the overall 'stability' of [Plaintiff]'s condition to dismiss or minimize [her] documented symptoms." (Docket Entry 11 at 7 (quoting Tr. 26-27).) In that regard, Plaintiff notes that her "MSEs continually and consistently document[ed] her severe symptoms" (<u>id.</u>) and, "even if . . . the ALJ merely meant that [Plaintiff]'s condition was unchanged, that also would not support the ALJ's reasoning[,] . . . [because] a description of a condition as 'stable' does not conflict with disabling limitations being present" (<u>id.</u> (citing, <u>inter alia</u>, <u>Ward v. Colvin</u>, 90 F. Supp. 3d 510, 513 (E.D.N.C. 2015), <u>Brooks v. Colvin</u>, No. 7:13CV161, 2014 WL 3535113, at *6 (E.D.N.C. June 23, 2014) (unpublished), <u>recommendation adopted</u>, 2014 WL 35314089 (E.D.N.C. Jul. 16, 2014) (unpublished), <u>O'Neal v. Commissioner of Soc. Sec.</u>, No. 1:10CV531, 2011 WL 4383724, at *16 (S.D. Ohio Aug. 24, 2011) (unpublished), <u>recommendation adopted</u>, 2011 WL 4383521

14

(S.D. Ohio Sept. 20, 2011) (unpublished), and <u>Lechner v. Barnhart</u>, 321 F. Supp. 2d 1015, 1029-30 (E.D. Wis. 2004))). According to Plaintiff, "[t]his is even more true when it is the ALJ, and not the claimant or the medical provider, who supplies the opinion that the claimant's examinations demonstrate 'stability.'" (<u>Id.</u> at 8; <u>see also</u> <u>id.</u> n.2 (observing that, "[e]ven when Dr. Conner noted that [Plaintiff] seemed stable 'for now,' he also noted that she continued to struggle and that she was disabled considering her overall symptom burden" (comma moved to inside quotation mark) (quoting Tr. 1058)).)

The ALJ's observations that "[MSEs] consistently revealed overall clinical <u>stability</u> no matter [Plaintiff's] complaints" (Tr. 26 (emphasis added)), and that "the overall evidence of record suggest[ed] that she remained <u>stable</u>" (Tr. 27 (emphasis added)) fail to provide a cogent basis for discounting Plaintiff's subjective reports regarding the intensity, persistence, and limiting effects of her OCD symptoms. Dr. Conner's MSEs <u>consistently</u> reflected fearful and/or anxious mood and affect, impaired attention, ruminations, and precise speech (<u>see</u> Tr. 622, 625, 628, 631, 641, 647, 650, 654, 657, 660, 663, 666, 669, 673, 676, 678-79, 684, 853, 857, 860, 1028, 1031, 1034, 1037, 1046, 1049, 1052, 1055, 1058, 1062, 1065, 1068, 1071, 1074, 1077, 1081, 1092, 1145, 1148, 1151, 1154, 1157, 1160, 1163, 1166, 1169, 1172, 1175, 1178, 1181, 1187, 1191, 1197, 1200), and often reflected

15

drowsiness (see Tr. 622, 625, 628, 631, 641, 647, 650, 654, 657, 660, 663, 666, 669, 1175, 1178, 1181). Indeed, on several occasions, Dr. Conner noted that he had difficulty redirecting Plaintiff as she fixated on discussing certain topics. (See Tr. 684, 675, 1033, 1035, 1144.) Moreover, even when Dr. Conner noted that Plaintiff appeared "stable," he did so only in the context of noting that her severe symptoms had not changed for the better or worse and continued to opine that her symptoms disabled her. (See Tr. 1058 (observing that "[Plaintiff] seems stable for now, but she's struggling, and I consider her disabled given current symptom burden" (emphasis added)), 1081 (noting that "[Plaintiff] appears stable, but she's so hypersensitive about reducing Klonopin that's it's been hard to move that taper forward" and that "[s]he's not able to work yet and may not be for the next year or two at this rate" (emphasis added)).)

Thus, Plaintiff's mental symptoms remained "stable" only insofar as they remained consistently severe and, thus, the observation by the ALJ of overall "stability" in Plaintiff's mental condition (Tr. 26; see also Tr. 27) does not provide substantial evidence to support the ALJ's discounting of Plaintiff's subjective reports of OCD symptoms. See Ward, 90 F. Supp. 3d at 513 ("[T]he ALJ found that [the treating physician]'s notation that [the] plaintiff's condition was 'stable' was in direct conflict with [the physician's] limitations as presented in the [RFC] report. The

16

[c]ourt agrees with [the] plaintiff that, in this context, a notation that a condition is 'stable' is <u>reasonably interpreted as meaning that the condition is not changing, not that the condition is improving</u> as was suggested by the ALJ." (emphasis added)); <u>Brooks</u>, 2014 WL 3535113, at *6 ("[T]he fact that [the] plaintiff told [her treating neurologist] . . . that her headaches were 'generally stable' is not the equivalent of a finding of improvement, as the ALJ's finding suggests." (internal parenthetical citation omitted)); <u>O'Neal</u>, 2011 WL 4383724, at *16 ("[T]he fact that [the treating physician] assessed [the] plaintiff's fibromyalgia as 'stable' is not inconsistent with [the physician's] finding that [the plaintiff's] functional capacity is nonetheless limited and does not mean that [the] plaintiff did not experience the . . . symptoms noted throughout the record which contributed to her limited functional capacity. . . . [The treating physician]'s characterization of [the] plaintiff's fibromyalgia as 'stable' does not undermine [the physician's] assigned limitations."); <u>Lechner</u>, 321 F. Supp. 2d at 1029-30 ("One can be stable and yet disabled.").

Next, Plaintiff maintains that "the ALJ . . . erred [] by essentially weighing [Plaintiff's] normal [fund of knowledge, intact language, intact insight, and intact judgment] . . . that are irrelevant to the severity of OCD against the abnormal signs that substantiated [Plaintiff]'s OCD." (Docket Entry 11 at 9

17

(citing <u>Arakas</u>, 983 F.3d at 97-98, for proposition that ALJ "may not discount a claimant's subjective complaints by relying on the lack of objective evidence that would not be produced by such a condition").) According to Plaintiff, "intact language, judgment, insight, etc. simply have nothing to do with OCD[, which ] is a disease that features a pattern of unwanted thoughts and fears that lead to repetitive behaviors." (<u>Id.</u> at 8 (citing "Obsessive-compulsive disorder (OCD)," Mayo Clinic, Dec. 21, 2023, https://www.mayoclinic.org/diseases-conditions/obsessive-compulsive-disorder/symptoms-causes/syc-20354432).) Plaintiff further points out that "OCD does not necessarily impact one's insight, memory, or judgment" (<u>id.</u> at 9) and that, "in most cases of OCD, the patient does have some insight in realizing that the [OCD-related] thoughts are illogical" (<u>id.</u> (citing "About OCD," International OCD Foundation, https://iocdf.org/about-ocd)). In Plaintiff's view, "the ALJ here 'improperly increased [Plaintiff's] burden of proof' by essentially requiring documentation of symptoms not typically produced by her condition to substantiate the severity of her well-documented existing symptoms." (<u>Id.</u> (quoting <u>Shelley C.</u>, 61 F.4th at 361-62).)

At the outset, Plaintiff has not shown that the ALJ erred by relying on MSE findings of <u>logical</u> thought processes and intact <u>judgment</u> to discount Plaintiff's subjective complaints of OCD symptoms. Such findings could undermine, to some degree,

18

Plaintiff's subjective reports that her contamination obsessions, cleaning rituals, and fixation on her benzodiazepine taper (and her perception of its debilitating side effects) disabled her. (See Tr. 48-52, 55-63.) However, as Plaintiff argues, the ALJ also relied on other MSE findings such as full orientation, intact associations, organized and linear thought processes, intact language for repetition, intact memory, excellent fund of knowledge, and intact insight in discounting the intensity, persistence, and limiting effects of Plaintiff's OCD symptoms, without explaining why those findings held any relevance to the severity of Plaintiff's OCD symptoms (see Tr. 25-27), which impacted her mood and affect, attention, concentration, stress tolerance, and ability to adapt to change (see, e.g., Tr. 48-52, 55-63, 331, 337 (containing Plaintiff's testimony and statements regarding her OCD symptoms), 867 (reflecting LCSW Milan's opinion that Plaintiff's OCD caused marked limitation in her ability to adapt to change)). More troubling, the ALJ gave only passing acknowledgment to Dr. Conner's repeated findings of impaired attention and ruminations, i.e., symptoms that directly correlate to Plaintiff's OCD symptoms, describing them as "vague[]" without an explanation of why such consistent observations by a treating psychiatrist qualify as "vague" and not worthy of greater credence. (See Tr. 25 ("[Plaintiff's] psychiatrist vaguely noted 'impaired' attention during a February 2020 visit." (emphasis added)), id.

19

("[Plaintiff's] psychiatrist vaguely noted 'ruminations' and 'impaired' attention." (emphasis added)).) Accordingly, on balance, the ALJ's discussion of Plaintiff's MSEs also fails to support her decision to discount Plaintiff's subjective complaints of OCD symptoms.

Plaintiff additionally faults the ALJ for "inexplicably not[ing] (and repeatedly so) that [Plaintiff]'s ability to 'self-direct an extended and complicated taper off of her benzodiazepines' [wa]s inconsistent with her allegations." (Docket Entry 11 at 9 (quoting Tr. 25-27).) In Plaintiff's view, the ALJ's reliance on Plaintiff's ability to self-direct the taper to discount her subjective symptom reports reflects "a mischaracterization of [the] taper which, itself, seems to be a time-consuming and debilitating symptom of her OCD." (Id.) According to Plaintiff, "[her] slow taper is not a testament to her functional capacity but rather is itself a debilitating fixation and obsession likely associated with her severe OCD." (Id. at 11.)

The ALJ's repeated reliance on Plaintiff's ability to self-direct a benzodiazepine taper as evidence inconsistent with Plaintiff's assertions of disabling OCD symptoms (see Tr. 25-27) represents a fundamental misunderstanding of the symptoms Plaintiff alleged she experienced. Rather than evidence of Plaintiff's ability to function mentally, her fixation and ruminations about the taper and perception of a wide array of physical and mental

20

symptoms resulting from each small, incremental reduction in her Klonopin dose constitute evidence supporting the debilitating nature of her OCD symptoms. In fact, Dr. Conner offered the following repeated opinions that Plaintiff's OCD symptoms likely caused her to insist (and fixate) on a painstakingly slow, self-directed taper off Klonopin:

- "I think [Plaintiff's] shaving of a solid tablet [with a razor blade to effect a tiny decrease in dose] is tedious and <u>possibly plays into her OCD</u>" (Tr. 632 (emphasis added));

- "[Plaintiff] has such a sensitivity to tapering the Klonopin. I've genuinely never seen anyone advance as incrementally as she does . . . . But I <u>wonder how much of her reaction to Klonopin reduction is about an OCD observation of how she feels at baseline and attributing this to Klonopin</u>." (Tr. 626 (emphasis added));

- "[Plaintiff] dropped 0.1 mg of Klonopin and almost fell to pieces. Most people can drop 0.5-1mg every week, and it's taken her close to a year to drop 1.5mg. <u>Her OCD is tough</u> . . . ." (Tr. 854 (emphasis added));

- "[Plaintiff] appears stable, but she's so hypersensitive about reducing Klonopin that it's been hard to move that taper forward. In about two years, she's gone from 3.5mg a day to 2mg a day, with a <u>perception</u> of great physical difficulty with each small step." (Tr. 1081 (emphasis added));

- "[Plaintiff] still has such a tough time reducing clonazepam, which <u>I wonder may be her OCD presenting</u> though I can't rule out sensitivity to withdrawal symptoms" (Tr. 1078 (emphasis added));

- "I don't think [Plaintiff]'s presentation is that different on 1.6mg compared to 1.8 but her <u>reported experience</u> of chaos when the dose drops has severely constrained her life" (Tr. 1069 (emphasis added));

21

- "[Plaintiff] <u>struggles to separate her identity from the medical issues, which I think is a function of her OCD</u>, and I see how the <u>anxiety and somatic focus would not allow for regular work</u>" (Tr. 1066 (emphasis added));

- "[Plaintiff] wants to keep reducing the benzo[diazepine], and I approve of that plan, but she goes so slow and really doesn't seem to have many tools to manage anxiety without the medicine and <u>seems fixated on the benzo[diazepine]</u>, so I fear that disability will continue even after this slow taper" (Tr. 1052 (emphasis added));

- "I remain in support of disability, as evidenced by [Plaintiff's] anxiety in session and her <u>difficulty redirecting rigid thought around the tiny rate of reduction in her benzo[diazepine]</u>" (Tr. 1035 (emphasis added));

- "I continue to consider [Plaintiff] disabled - tiny reductions in the dose of her benzo[diazepine] lead to a week of wild physical symptoms, and <u>so much of her mental space is occupied by fixation on this years-long taper, I don't think she could consistently attend or complete work</u>" (Tr. 1028 (emphasis added));

- "[Plaintiff]'s challenge to drop a tenth of a milligram <u>consumes her and makes it impossible for her to accomplish paid work</u>" (Tr. 1145 (emphasis added));

- "[Plaintiff] has again dropped a tenth of a milligram and reports wild swings in her body - people can have difficult withdrawal, but <u>her concurrent intense anxiety condition can also influence this experience</u>" (Tr. 1154 (emphasis added));

- "[Plaintiff] again reports disruptive symptoms from decreasing a tiny amount of benzo[diazepine], and given the anxiety she has about contamination, <u>I wonder how much of this is anxiety about going down on the dose distorting the experience of the decrease itself</u>. Regardless of the origin, she is

22

obviously not well enough to do paid work at this point."  (Tr. 1163 (emphasis added);

- "Again, [Plaintiff]'s tiny reductions in dose are associated with marked physical and mental problems, and <u>I'm not sure how much is the withdrawal and how much is anxiety about the withdrawal</u>, but regardless, she can't work in states like this" (Tr. 1166 (emphasis added));

- "[Plaintiff] recognizes <u>she spends a long time shaving her pills and does not believe she can safely reduce any faster</u> based on discomfort in previous dose reductions. . . .  [Her] <u>anxiety runs her life, forcing tiny slow changes in her benzo[diazepine]</u> and keeping her from adequate social support."  (Tr. 1168-69 (emphasis added)); and

- "Again, [Plaintiff] is sure that her discomfort is related to the dose reduction, but <u>I'm not sure it's not just her baseline.  Her anxiety is such a problem, and it gets in the way of making decisions</u> even now, so I support disability in this state." (Tr. 1172 (emphasis added)).

Given these consistent opinions from Plaintiff's treating psychiatrist that Plaintiff's OCD likely resulted in her fixation on the slow, self-directed Klonopin taper, the ALJ's reliance on that taper as a basis to <u>discount</u> Plaintiff's subjective reports of OCD symptoms constitutes an additional error.

In light of the ALJ's above-described failure to support her evaluation of Plaintiff's subjective symptom reports with substantial evidence, the Court will order remand.[7]  Although

---

[7] The ALJ here discounted the opinions of Dr. Conner, in part, because those "opinion[s were] not supported by his repeated notes of [Plaintiff's] <u>organized and linear thought processes, intact recent memory, and intact language for repetition</u>" and "[were] also inconsistent with the overall evidence of record, which includes <u>similar findings</u> from prior mental health providers on [MSE]."  (Tr. 28 (emphasis added).)  Similarly, the ALJ found "not persuasive"

Plaintiff alternatively requested the Court to "revers[e ] the ALJ's decision for payment of benefits" (Docket Entry 11 at 12), she did not develop an argument in support of reversal for payment of benefits (see id. at 5-12) and, given evidence in the record such as findings of logical thought processes and intact judgment that supported the ALJ's evaluation of Plaintiff's subjective symptom reporting, the record evidence would not have compelled the ALJ to find Plaintiff disabled.

Lastly, absent a showing of judicial bias, "'[t]o whom a case should be remanded is generally within the province of the [Commissioner's] responsibility.'" Lloyd v. Astrue, No. 5:09CV292, 2010 WL 2812672, at *2 (E.D.N.C. June 9, 2010) (unpublished) (quoting Travis v. Sullivan, 985 F.2d 919, 924 (7th Cir. 1993)), recommendation adopted, 2010 WL 2812674 (E.D.N.C. July 14, 2010) (unpublished). Nonetheless, "a number of courts have . . . recommended reassignment of [S]ocial [S]ecurity cases on remand for various reasons other than bias." Sherman v. Berryhill, Civ. No. 18-439, 2019 WL 2450919, at *16 (D.N.M. June 12, 2019) (unpublished) (due to ALJ's "fail[ure] to consider the medical evidence with adequate care," recommending "that the Commissioner

---

the opinions of LCSW Milan, in part, because "such opinions [we]re not consistent with the overall evidence of record, which includes notes of [Plaintiff's] repeatedly cooperative nature, good eye contact, and ability to self-direct a taper off benzodiazepines." (Id. (emphasis added).) As the Court has found improper the ALJ's reliance on 1) normal MSE findings that did not correlate with Plaintiff's reported OCD symptoms, and 2) her self-directed benzodiazepine taper, to discount her OCD symptoms, the ALJ similarly erred by relying on those same bases to reject the opinions of Dr. Conner and LCSW Milan.

24

assign th[e] case to a different ALJ on remand," but "not requir[ing] the Commissioner to do so"). Here, the ALJ's first decision on Plaintiff's claim for benefits resulted in an Appeals Council remand (Tr. 138-43), and the ALJ's instant decision has now resulted in an order of remand from this Court. "Consequently, and in light of the many years during which [Plaintiff]'s [S]ocial [S]ecurity claim[] ha[s] now been pending, the Court concludes that, rather than have the same ALJ review the claims a third time, a fresh look by another ALJ would be beneficial." Sherman, 2019 WL 2450919, at *16 (internal quotation marks omitted). "Thus, the Court recommends that the Commissioner assign this case to a different ALJ on remand, though the Court does not require the Commissioner to do so." Id.

### III. CONCLUSION

Plaintiff has established errors warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **VACATED**, and that this action is **REMANDED** under sentence four of 42 U.S.C. 405(g), with a suggestion that the Commissioner consider assigning a different ALJ to conduct the further administrative proceedings, and a directive that the further administrative proceedings shall include 1) re-evaluation of Plaintiff's subjective symptom reports in accordance with this decision, 2) re-assessment of the persuasiveness of the opinions of

25

Dr. Conner and LCSW Milan in accordance with this decision, and 3) redetermination of Plaintiff's RFC.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 21, 2026

26